**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED NATIONAL INSURANCE COMPANY,**

          **Plaintiff/Counter Defendant,**

    **vs.**                              **1:13-CV-741**
                                                  **(MAD/CFH)**

**PROGRAM RISK MANAGEMENT, INC.; PRM**
**CLAIM SERVICES, INC.; JOHN M. CONROY;**
**GAIL S. FARRELL; COLLEEN E. BARDASCINI;**
**THOMAS B. ARNEY; CAROLYN ARNEY;**
**EDWARD A. SORENSON; MARK J. CRAWFORD;**
**and RUTH O'CONNOR,**

          **Defendants/Counter Claimants.**
_____

**APPEARANCES:**               **OF COUNSEL:**

**OFFICE OF BRAD C. WESTLYE**      **BRAD C. WESTLYE, ESQ.**
225 East 96th Street 6R
New York, New York 10128
Attorneys for Plaintiff/Counter Defendant

**OFFICE OF JAMES B. TUTTLE**        **JAMES B. TUTTLE, ESQ.**
10 Century Hill Drive, Suite 4
Latham, New York 12110
Attorneys for Defendants/Counter Claimants

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff United National Insurance Company ("United National" or "Plaintiff")

commenced this action on June 24, 2013, seeking an order rescinding three Professional Liability

Insurance Policies for Insurance Agents and Brokers (collectively "the Policies"). *See* Dkt. No. 1.

In their complaint, United National contends that it would not have issued the Policies had

Defendant Program Risk Management, Inc. ("PRM") disclosed known and highly pertinent information in the application process. *See id.*[1]

Currently before the Court is United National's motion for summary judgment or, in the alternative, motion for partial summary judgment. *See* Dkt. No. 53.

## II. BACKGROUND[2]

**A.    Group self insured trusts in New York**

In New York State, employers are obligated to secure the payment of compensation to their employees from on the job injuries. Section 50 of the Workers' Compensation Law permits them to do so through the State Insurance Fund, by purchasing a private insurance policy, or by self insurance. In 1966, the Legislature added subdivision 3-a to Workers' Compensation Law § 50 to permit smaller employers in similar fields to exercise the privilege of self-insurance by joining together as members of group self-insured trusts ("GSITs"). *See Held v. N.Y.S. Workers' Compensation Bd.*, 85 A.D.3d 35, 38 (3d Dep't 2011) (citing L. 1966, ch 895, § 2; ch 896, § 2).

The original version of Section 50 did not contain the provisions now set forth at Subsection 3-a(2)(b) requiring that all GSITs submit annual proof that they were "fully funded." Until 2008, the statute itself did not contain the words "fully funded" or any definition thereof.

In 2001, a series of regulations were adopted that significantly changed the way that GSITs were administered in New York. *See* 12 N.Y.C.R.R. §§ 317.1-317.22. Until these

---

[1] The Court notes that United National amended their original complaint on three occasions and that the third amended complaint is now the operative pleading in this matter. *See* Dkt. No. 40.

[2] The Court appreciates the efforts made by counsel prior to filing the pending motion for summary judgment and response thereto. Through their efforts, they have stipulated to a significant portion of the underlying factual background, which greatly assists the Court rendering a decision on the pending motion.

regulations were passed, Generally Accepted Accounting Principles ("GAAP") was the only relevant accounting standard. *See* Dkt. No. 58 at 8-10 (describing in detail the changes brought about by these new regulations).

In 2008, the New York Legislature made several drastic changes to Section 50 of the Workers' Compensation Law. One such change included adding the following language to Section 50-3(a)(2)(b):

> The chair shall require each group self-insurer to provide regular reports no less than annually, which shall include but not be limited to audited financial statements, actuarial opinions and payroll information containing proof that it is fully funded. Such reports shall also include a contribution year analysis detailing contributions and expenses associated with each specific contribution year. For purposes of this paragraph, proof that a group self-insurer is fully funded shall at a minimum include proof of unrestricted cash and investments permitted by regulation of the chair of at least one hundred percent of the total liabilities, including the estimate presented in the actuarial opinion submitted by the group self-insurer in accordance with this chapter. The chair by regulation, may set further financial standards for group self-insurers. Any group self-insurer that fails to show that it is fully funded shall be deemed underfunded, and must submit a plan for achieving fully funded status which may include a deficit assessment on members of such group self-insurer which shall be subject to approval or modification by the chair. The chair may impose such limitations on admission of new members or offering of discounts on underfunded group self-insurers to insure that such group self-insurers shall become fully funded. Should the group self-insurer fail to meet the terms of its plan, the chair may condition its continued authorization to act as a group self-insurer on the appointment of an outside monitor selected by the chair, at the group self-insurer's expense. Effective January first, two thousand fourteen, any group self insurer that fails to show it is fully funded in accordance with this paragraph and the regulations issued pursuant thereto shall have one year to cure the deficiency. If such deficiency is not cured within one year, the group self-insurer shall be given six months to terminate its coverage.

N.Y. Workers' Comp. Law § 50-3(a)(2)(B).

As such, the concepts of fully-funded and underfunded status, which had previously only existed in the regulations of the Workers' Compensation Board were codified and the chairman of the Workers' Compensation Board was charged with ensuring that all GSITs operating in the state were "fully funded" as defined in the new statute. As such, according to PRM, a GSIT could now be deemed underfunded by the Workers' Compensation Board chairman, despite the fact that it was fully funded under GAAP principles. *See* Dkt. No. 58 at 11.

**B.      The parties and underlying facts**

PRM is an insurance intermediary that at the time relevant to this action specialized in providing its client insureds with non-traditional types of workers compensation insurance. *See* Dkt. No. 53-2 at ¶ 1. PRM was during times relevant here the program or group administrator for several New York workers' compensation self-insurance trusts. These trusts included: the Health Care Providers Self Insurance Trust ("HCPSIT"); the Community Residence Insurance Savings Plan Self-Insurance Trust ("CRISP Trust"); the TEAM Transportation Workers Compensation Trust ("TEAM Trust"); and the Empire State Towing and Recovery Association ("ESTRA Trust"). *See id.* at ¶ 2. PRM was also the program or group administrator for the HCP WC Insurance Program, LLC, a Captive Insurance Program. *See id.* The HCPSIT, CRISP Trust, TEAM Trust, and ESTRA Trust were group self-insured trusts for the workers compensation obligations of certain members of the health care services and towing industries who pooled their resources to fund the trusts' ability to pay their employees' workers compensation claims where the trusts ceded only their excess of loss claims to standard insurers. *See id.* at ¶ 3. The HCP WC Insurance Program, LLC was a captive or fronting insurance plan underwritten by an affiliate of the Travelers Insurance Company. *See id.* at ¶ 4.

PRM Claim Services, Inc., a close affiliate of PRM, at various times handled the workers' compensation claims administration for the trusts and the HCP WC Insurance Plan. *See id.* at ¶ 5. In its capacity as administrator for these trusts and the captive insurance plan, PRM acted, in part, much as a retail insurance producer does, except that instead of procuring insurance policies for its clients, it handled their customer's participation in self-insurance trusts, or their captive insurance plan. *See id.* at ¶ 6. Under this arrangement, the security for PRM's clients' workers compensation risks as to the trusts was a combination of the self-insurance trusts and excess insurance policies issued through commercial insurance companies as required by the Workers' Compensation Board, while the security for the PRM's clients' workers compensation risks as to the captive insurance program, was the fronting insurance company which was reimbursed in whole or in part for losses by the plan participants. *See id.* at ¶ 7. Thus, the security for the PRM administered trusts/plan varied from standard commercial workers compensation policies available in the retail commercial insurance market. *See id.* Numerous lawsuits have been filed against PRM and PRM Claim Services which, in significant part, allege that PRM, PRM Claim Services, and their officers and owners (also United National's insureds and Defendants to this case) contributed to the insolvency, under funded status and/or financial inability of their former trusts to pay their members' eventual workers' compensation obligations. *See id.* at ¶ 8.

**C.      The 2009 Policy**

According to United National, Policy No. EO-016134 was underwritten and administered by Doran Excess Underwriters, Inc. ("Dorex") in Pennsylvania who worked in the capacity of United National's managing general underwriter for the risk. *See* Dkt. No. 53-2 at ¶ 9. PRM, however, contends that, "while the 2009 policy was apparently underwritten by Dorex, that company went out of business during the term of the policy and when John Conroy attempted to

contact them for administrative purposes during the life of the policy, he was unable to do so and had to contact [United National] directly." Dkt. No. 61 at ¶ 3. PRM was both a named insured and the retail insurance producer for the 2009-2010 policy. Consequently, Dorex's communications concerning the risk were directly with the insured, PRM. *See* Dkt. No. 53-2 at ¶ 10.

Underwriters first solicited PRM's renewal application for the 2009 policy in a letter dated May 6, 2009. *See id.* at ¶ 12. Neither PRM nor PRM Claim Services disclosed to Dorex or United National that the Workers Compensation Board ("WCB"), as the regulator for group self-insurance trusts, had withdrawn the self-insurer status of the Healthcare Providers Self-Insurance Trust and closed the Trust several weeks before PRM and PRM Claim Services submitted applications for the August 9, 2009 renewal of their Insurance Agents and Brokers Professional Liability policy. *See id.* at ¶ 13.

The records establish that the WCB had been in ongoing discussions with the HCPSIT and PRM for many months before the Trust was involuntarily closed effective June 30, 2009. *See id.* at ¶ 14. The WCB sent an October 8, 2008 letter to the HCPSIT and John Conroy identifying that for the 2007 fiscal year, the trust had a 37% regulatory trust equity ratio and a regulatory deficit of $26.6 million. The letter states that the HCPSIT was then the lowest funded group in New York State. *See id.* at ¶ 15. The WCB Chair sent a March 26, 2009 letter to the HCPSIT and the Group Administrator (PRM) stating that because the financial stability of the Trust could not be restored, the WCB would close the Trust effective June 30, 2009. *See id.* at ¶ 16. The letter also states, "[d]ue to the significant financial deficit, the trust is prohibited from paying dividends, refunds, credits, returns of contributions or adjustments of any kind to members without prior approval of the WCB." *Id.* John Conroy sent a March 31, 2009 email to the WCB

acknowledging the WCB's intent to close the HCPSIT and asking for clarification of the no return contributions/premiums order. *See id.* at ¶ 17. On April 24, 2009, the HCPSIT sent a letter to its members advising them the WCB may close the HCPSIT effective June 30, 2009, and announcing that they were working towards offering alternative coverage under a "Captive self-insurance program." *Id.* at ¶ 18.

The WCB sent a May 4, 2009 letter to the HCPSIT and John Conroy that states, in part, "[i]n light of the precarious financial position of this Trust, we are concerned that the insolvency threshold has already been or will shortly be triggered, thus leaving us with no option but to assume possession." Dkt. No. 53-2 at ¶ 20. The WCB also reiterated its order that no contributions/premiums were to be returned to trust members. *See id.* On May 14, 2009 the HCPSIT sent a May 2009 Plan for Program Operation to the WCB to improve the finances of the Trust in an effort to dissuade the WCB from closing the Trust effective June 30, 2009. *See id.* at ¶ 21. The WCB sent a June 15, 2009 letter to the HCPSIT and John Conroy that states, in part, "[a]s discussed, the Board's previous determination to terminate HCP's ability to provide workers' compensation coverage effective June 30 will not be rescinded" and "the trust must immediately reaffirm its earlier notification to members that the coverage will terminate effective July 1st and ensure all appropriate termination forms are completed and supplied to the members of HCP and filed with the WCB in a timely manner." *Id.* at ¶ 22. On June 29, 2009, the WCB sent an email to John Conroy seeking to have claims data for the HCPSIT sent to the WCB's claims administrator. *See id.* at ¶ 23. The WCB withdrew the self-insured status of the HCPSIT effective June 30, 2009. *See id.* at ¶ 24.

The WCB sent a June 19, 2009 letter to the CRISP Trust and the Trust Administrator (PRM) stating that as to the year ending November 30, 2008, the CRISP Trust is deemed to be

under funded with a Regulatory funding ratio of 75.15% and setting up a meeting to address remediation. *See* Dkt. No. 53-2 at ¶ 25. The WCB sent an August 6, 2009 letter to the CRISP Trust and the Group Administrator (PRM) stating that the trust had a regulatory trust equity ratio of about 75% for 2008, and that the Trust would submit to the WCB a plan outlining steps for the Trust to achieve a 100% funding level. *See id.* at ¶ 26. The 75.15% regulatory trust equity ratio for 2008 for the CRISP Trust correlated to an accumulated regulatory deficit of $3,583,470. *See id.* at ¶ 27.

On March 20, 2008, the WCB sent a letter to the TEAM Trust and the Trust Administrator (PRM) enclosing a Consent Agreement Order and Consent Agreement wherein the TEAM Trust acknowledged that for the fiscal period ending December 31, 2006 the Trust was 84.44 percent funded with an accumulated regulatory deficit of $1,793,169 and that the Trust was under funded. *See id.* at ¶ 28. John Conroy was aware of the TEAM Trust Consent Agreement. *See id.* at ¶ 29.

The WCB sent a February 19, 2009 letter to the ESTRA Trust and the Trust Administrator (PRM) stating that as to the fiscal year ending March 31, 2008, the ESTRA Trust was deemed to be under funded with a Regulatory funding ratio of 72.4%. *See id.* at ¶ 30. Again, John Conroy was aware of this February 19, 2009 letter. *See id.* at ¶ 31.

For the 2009 renewal policy, the insurance applications of PRM and PRM Claim Services, Inc. were submitted and considered together, as they related to closely held affiliate corporations insured under one policy of insurance. *See id.* at ¶ 32. Both 2009 applications were signed on July 24, 2009 by John Conroy as "president." *Id.* at ¶ 33. The 2009 policy Application from PRM states that the source of 95% of PRM's annual property/casualty gross written premiums was "Workers Comp (Self-Funded)." *Id.* at ¶ 34.

The 2009 application from PRM contains the following question and answer:

8e) Is a significant change in Applicant's Premium Volume or New Commissions anticipated in the next 12 months?

Yes, transfer one group to Captive Insurance.

*Id.* at ¶ 35. By the date of the application, the transfer to Captive Insurance of the one group had already taken place, as the HCPSIT was closed effective June 30, 2009 and all the participants were required to have alternate coverage at that time. *Id.* at ¶ 36. Further, PRM provided no response to the following question: "List *all* insurance carriers with which contracts have been terminated in the last five years (include the reason(s) for such termination)." *Id.* at ¶ 37. Moreover, when asked "[a]re there any circumstances which may result in errors or omissions claims being made against Applicant, past or present owner, partner, officer, employee or non-employee producer or its predecessors in business," PRM responded in the negative. *Id.* at ¶ 38.

As to the PRM Claim Services, Inc., the 2009 application contained the following question and answer:

22. Are numbers projected for self-insured accounts actuarially sound/developed?

Yes. Sterglou & Gruber Risk Consultants, By The Numbers Acturio Service, Liscord Ward & Roy, Reqnier Consultants [handwriting is partially illegible].

Dkt. No. 53-2 at ¶ 42. The WCB wrote a December 5, 2006 letter to the HCPSIT and PRM specifically calling into question the accuracy of the actuarial work of SGRisk, LLC stating that its reports may have underestimated one trust's liabilities by 250%. The letter states the WCB will "require that the Trust not pay any member dividends declared until the completion of the actuarial review." *Id.* at ¶ 43. The HCPSIT stated in its May 2009 Plan for Program Operation submitted to the WCB in an effort to avoid the closure of the Trust that the Trust would "promptly sever its relationship with its current actuary, Sterglou & Gruber." *Id.* at ¶ 44.

Moreover, when asked if "any insurance company which provides benefits under any plan/trust administered by the applicant ever declared insolvency or has or is experiencing financial difficulties," PRM Claim Services, Inc. responded in the negative. *See id.* at ¶ 45. On May 14, 2009, the HCPSIT sent to the WCB a plan to generate $16 million to $19 million as an assessment levy and extraordinary charge to its past and existing members in an effort to prevent the WCB from closing the Trust. *See id.* at ¶ 47; *see also* Dkt. No. 61 at ¶ 4.

The workers compensation claims of the HCPSIT members' employees injured during the viability of the Trust still had to be paid after the Trust closed. *See* Dkt. No. 53-2 at ¶ 48. Shortly before the HCPSIT Trust was closed, the WCB wrote a letter asking for the HCPSIT to provide information on how it was going to increase its finances to meet the criteria of having sufficient assets to pay at least six months' of claims. *See id.* at ¶ 49. In its 2009 application, PRM Claim Services, Inc. responded to the following question in the negative: "Is it anticipated that within the next twelve (12) months any insurance company which provided benefits under any plan/trust administered by this applicant may become insolvent or may experience financial difficulties?" *Id.* at ¶ 50. Despite this assertion, before submitting the 2009 Applications, PRM or PRM Claim Services and the HCPSIT were vying to have the WCB allow them to continue to administer the run-off of the Trust after it was closed. *See id.* at ¶ 51. By letters dated October 8, 2009 and October 13, 2009, the WCB advised that the plan submitted by the HCPSIT and PRM "fail[ed] to demonstrate HCP's ability to properly administer its liabilities" and the WCB ordered the transfer of the run-off administration to a state-sponsored administrator. *See id.* at ¶ 52.

The WCB sent letters dated March 26, 2009 and August 6, 2009 ordering that the HCPSIT not return any contributions, or assessments to its members because of the precarious financial condition of the Trust. *See* Dkt. No. 53-2 at ¶ 56. PRM did not disclose in the 2009 Application

process that the WCB had determined the trusts PRM administered were under funded. *See id.* at ¶ 58.

Once United National issued the renewal policy, PRM sought and obtained an increase in the limits of liability from $2 million to $5 million, although the original 2009 PRM Application sought an alternate quote for a $5 million limit, as did PRM's applications for several preceding policy terms. *See id.* at ¶ 59. In response to PRM's request for increased limits, underwriters specifically requested PRM's recent marketing materials. *See id.* at ¶ 60. In response, PRM stated that PRM Claim Services was the only insured that needed the higher limits and it did not have any marketing materials. *See id.* at ¶ 61.

United National contends that it and "Dorex relied on PRM and PRM Claim Services' representations made in the 2009 Applications in reaching the decision to issue the 2009 policy." *See id.* at ¶ 66; *but see* Dkt. No. 61 at ¶ 8. United National claims that had PRM and PRM Claim Services accurately answered the questions to the application for the renewal policy, the policy would not have been renewed, if at all, under the terms written. *See id.* Moreover, United National argues that it and "Dorex also relied on PRM and PRM Claim Services' representations made in the 2009 Applications and the communications concerning increasing the limits in reaching the decision to issue the endorsement increasing the limits of liability from $2 million to $5 million effective from August 25, 2009. Had PRM and PRM Claim Services accurately answered the questions to the application for the renewal policy, the policy would not have been renewed, if at all, under the terms written." *Id.* at ¶ 67. The 2009 Applications for the 2009 renewal policy were submitted on July 24, 2009 for a policy with a proposed effective date of August 9, 2009. *See id.* at ¶ 68.

**D.      The 2011 Policy**

United National's Policy Nos. BIA0000052 and BIA0000107, the 2011 and 2012 Policies, were underwritten directly by United National. *See* Dkt. No. 53-2 at ¶ 71. The applications for these policies and insurance transactions were submitted to United National through PRM's excess lines insurance broker, Special Risk Solutions, Inc., a division of Utica National Insurance Group. *See id.* United National received applications for an Insurance Agents and Brokers Errors and Omissions policy for PRM's 2011 policy term through PRM's insurance broker. *See id.* at ¶ 72. The 2011 applications submitted to United National were signed by PRM's president. *See id.* at ¶ 73.

In the 2011 application materials, PRM indicated that it had only one errors and omissions claim in the last five years. *See id.* at ¶ 74. Further, the application materials also indicated that the one suit involving PRM was actually against PRM Claim Services. *See id.* at ¶ 75.

The applications and related materials for the 2011 policy included PRM's broker's June 8, 2011 submission to United National of a Markel Application and a May 25, 2011 United National loss run, a June 16, 2011 "Insurance Agents and Brokers Quick Quote" form, a July 31, 2011 Chartis loss run for New Hampshire Insurance Company's 2010 policy, an August 3, 2011 United National application, and other correspondence. *See id.* at ¶ 77. The Markel Application for Agents and Brokers Errors and Omissions Liability Insurance signed by John Conroy and dated June 8, 2011 contains the following questions and responses:

> 1. During the last five years has the Applicant placed business with any insurance company, reinsurer, risk retention group, captive (or any other self-insurance plan or trust by whatsoever name) or any other organization that has been declared bankrupt, insolvent, or been placed in receivership, liquidation or rehabilitation or has been financially unable to meet all or part of its financial obligations?
>
> Response: "No"

2. During the last five years has the Applicant: . . . (c) Placed coverage with any self insured risk assuming organization or risk retention group?

Response: "No"

1. Does the Applicant act as Managing General Agent ("MGA"), Underwriting Manager and/or Program Administrator?

Response: "No"

* * * * *

4. In the last three years, other than minor infractions, were all audits by insurers satisfactory?

Response: [No response provided]

5. In the last five years has any: (a) MGA, Underwriting Manager or Program Administrator contract authority been canceled, revoked or terminated?

Response: [No response provided]

2. During the last five years, have there been any claims or proceedings arising out of professional services against the Applicant or any of its principals, partners, officers, directors, trustees, employees, managers or managing members or predecessors, subsidiaries, affiliates, and/or against any other person or organization proposed for this insurance?

Response: "Yes"

(a) If Yes, how many?  Response: "1 - see attached loss run"

(b) Attach a completed copy of our Supplemental Claim Form. [Not attached]

3. Is the Applicant and/or any of its principals, partners, officers, directors, trustees, employees, managers or managing members or any person(s) or organization(s) proposed for this insurance aware of any fact, circumstance, situation, incident or allegation of negligence or wrongdoing, which might afford grounds for any claim such as would fall under the proposed insurance?

Response: "No"

Dkt. No. 53-2 at ¶ 78.

PRM's August 3, 2011 application on the United National application form includes the following questions and responses:

> 15. List all insurance carriers with which contracts have been terminated in the last five years (include the reason(s) for such termination):
>
> Response: "N/A None"
>
> 23. Are there any circumstances which may result in errors and omissions claims being made against Applicant, past or present owner, partner, officer, employee or non-employee producer or its predecessors in business? (If yes, attach a detailed explanation)
>
> Response: "Yes per lawsuit already filed"

*Id.* at ¶ 80.

In the course of the application process, United National's underwriter required and obtained from PRM a "loss run" from the insurer whose 2010 policy was expiring. *See id.* at ¶ 82. United National received the Chartis loss run which showed that there were no claims and no losses for the 2010 policy term. *See id.* at ¶ 83.

In the 2011 application process, PRM did not expressly disclose several existing lawsuits: (1) *Personal Touch Home Care, Inc., et al. v. Program Risk Management, Inc., et al.*, Nassau County Supreme Court, Index No. 017065/2010; (2) *Health Care Providers Self Insurance Trust, et al. v. Program Risk Management, Inc., et al.*, Albany County Supreme Court, Index No. 3965-11 filed on June 9, 2011 (seeking $180 million in "damages"); (3) *New York State Workers Compensation Board, et al. v. Phyllis Wang, et al.*, Albany County Supreme Court, Index No. 004616/2011 filed on July 8, 2011 and served on Program Risk Management, Inc. on or about July 20, 2011 (seeking $188 million in "damages"); and (4) *Community Residence Insurance Savings Plan Trust v. M.P. Agency, Inc. et al.*, Albany County Supreme Court, Index No.

3717/2011 filed on May 25, 2011 and served on Program Risk Management, Inc. via the

Secretary of State on May 27, 2011 (seeking "damages" in excess of $6 million). *See* Dkt. No.

53-2 at ¶ 84. PRM acknowledges that it did not "expressly disclose" these lawsuits "because each

of them had already been turned over to United National and United National was already in the

process of defending those lawsuits during the course of the 2011 application process." Dkt. No.

61 at ¶ 11.[3]

The WCB sent a June 28, 2011 letter advising it would close the CRISP Trust effective

August 1, 2011. *See* Dkt. No. 53-2 at ¶ 92. The letter stated that the "Workers' Compensation

Board (Board) has determined that Community Residence Insurance Saving Plan SI Trust

(CRISP), currently administered by PRM, has demonstrated an inability to properly administer its

liabilities. Therefore, pursuant to 12 NYCRR Section 317.20(c), effective August 1, 2011 the

Chair will assume the administration and final distribution of the group's assets and liabilities."

*Id.* This letter was sent by certified mail to PRM and Edward Sorenson, PRM's Executive Vice

President. *See id.* at ¶¶ 93-94.

Immediately before John Conroy's signature on PRM's August 3, 2011 application on the

United National application form is the following language: "Applicant understands and agrees

that Applicant is obligated to report any changes in the information provided in this application

and the materials furnished in conjunction with this application that occur after the date of the

application and prior to the inception of any coverage." *Id.* at ¶ 97. Moreover, the Markel

Application form containing John Conroy's signature dated June 8, 2011 contains the following

statement:

---

[3] United National is presently defending PRM and PRM Claim Services in the four
lawsuits listed and others under a reservation of rights to obtain rescission of all the applicable
policies for misrepresentation and concealment. *See* Dkt. No. 53-2 at ¶ 105.

> No fact, circumstance, situation or incident indicating the
> probability of a claim or action for which coverage may be afforded
> by the proposed insurance is now known by any person(s) or
> organization(s) proposed for this insurance other than that which is
> disclosed in this application. It is agreed by all concerned that if
> there be knowledge of any such fact, circumstance, situation,
> incident or allegation of negligence or wrongdoing, any claim
> subsequently emanating therefrom shall be excluded from coverage
> under the proposed insurance.

Dkt. No. 53-2 at ¶ 103.

United National contends that, "[i]n reliance on the information disclosed in the 2011 application process, and without underwriter's knowledge of several of the actions that had been filed against PRM and PRM Claim Services before the inception of the 2011 policy, or the closure of the CRISP Trust, United National issued the 2011 policy to PRM with limits of liability of $5 million. Had PRM more accurately disclosed material facts in response to the questions in the applications and related materials for the 2011 policy including the disclosure to underwriters of its actual loss experience, the policy would not have been issued." *Id.* at ¶ 104; *but see* Dkt. No. 61 at ¶ 8.

**E.    The 2012 Policy**

The 2012 application dated July 9, 2012 was signed by John Conroy as the president of PRM. Dkt. No. 53-2 at ¶ 106. PRM's Application for the 2012 Policy contains the following question and response:

> During the past policy period, has the Agency . . . Placed coverage
> or had involvement with or acted as administrator for self insureds,
> captives or risk retention groups, risk purchasing groups; Multiple
> Employer Trusts (MET) or Multiple Employer Welfare
> Arrangements (MEWA)?
>
> Response: "No."

*Id.* at ¶ 107.

The WCB's December 7, 2011 letter involuntarily discontinuing the TEAM Trust states that it "has determined that Team Transportation WC Trust (Team Transportation), currently administered by Program Risk Management, Inc. (PRM), has demonstrated an inability to properly administer its liabilities. Therefore, pursuant to 12 NYCRR Section 317.20(c), effective February 1, 2012 the Chair will assume the administration and final distribution of the group's assets and liabilities." *Id.* at ¶ 108. On December 31, 2011, the ESTRA Trust was terminated, as it no longer qualified as a self-insurance trust. *See id.* at ¶ 110.

In the 2012 application, PRM answered in the negative to the question if "any claims been made against Applicant or is Applicant aware of any circumstances which may result in a claim being made against the Applicant, its predecessor in business, or any past or present partners, executive officers or directors that have not been reported to the insurance company[.]" *Id.* at ¶ 111.

In the *Community Residence Ins. Savings Plan Trust v. M.P. Agency, Inc., et al.*, Albany County Supreme Court, Index No. 3717/2011 action, the Workers Compensation Board sought to be substituted in as the real party in interest. *See* Dkt. No. 53-2 at ¶ 112. The court eventually dismissed that action without prejudice. *See id.* at ¶ 113. Thereafter, the WCB provided notice to United National of its claim and intent to sue PRM during United National's 2012 policy, and filed the complaint, as successor in interest to the CRISP Trust in Albany County Supreme Court on November 14, 2013. *See* Dkt. No. 63-2 at ¶ 115 (citing *CRISP Trust v. Program Risk Management, Inc., et al.*, Albany County Supreme Court, Index No. 3203/2013).

**F.     The pending motion**

In its motion for summary judgment, United National first argues that the 2009, 2011 and 2012 Policies should be rescinded for misrepresentations and concealment of material facts. *See*

Dkt. No. 53-1 at 20-31. United National contends that the undisputed facts permit the Court to determine as a matter of law that the misrepresentations and concealment were material. *See id.* at 31-32. Further, United National argues that they did not have a duty to undertake any or a more extensive investigation prior to issuing the policies to determine the completeness of PRM's representations and disclosures. *See id.* at 37-38. Finally, United National contends that breach of warranty under New York Insurance Law § 3106(b) provides an alternate legal basis for the rescission of United National's policies. *See id.* at 42.

Currently before the Court is United National's motion for summary judgment.

## III. DISCUSSION

**A.     Choice of law**

In its motion, United National asserts that New York law should apply to this matter because PRM is a New York corporation, the policies at issue were delivered to PRM in New York, and the subject of the underlying New York State Supreme Court litigation against PRM involves New York workers' compensation self-insurance trusts and captive insurance plans involving New York insureds. *See* Dkt. No. 53-1 at 13. Without discussion, PRM has assumed that New York law should apply. *See* Dkt. No. 58. None of the parties have cited to a choice-of-law provision in any of the policies, and the Court was unable to find one.

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citation omitted). "Under New York choice of law rules . . . where the parties agree that New York law controls, this is sufficient to establish choice of law." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (citation omitted). Such agreement may be implicit. *See id.* (citation omitted).

In the present matter, the parties' briefs assume that New York law controls. Therefore, under the New York choice-of-law rule, New York law applies. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (citation omitted).

**B.     Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**C.     Rescission *ab initio***

Under New York law, an insurer seeking to rescind an insurance policy must demonstrate that the insured "made a material misrepresentation" or omission in seeking coverage. *See Parmar v. Hermitage Ins. Co.*, 21 A.D.3d 538, 540 (2d Dep't 2005) (citations omitted); *see also* N.Y. Ins. Law § 3105(b); *Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP*, 379 F. Supp. 2d 442, 453 (S.D.N.Y. 2005) (citations omitted). Rescission of an insurance policy renders the policy "void *ab initio*." *Stein v. Sec. Mut. Ins. Co.*, 38 A.D.3d 977, 978 (3d Dep't 2007) (citations omitted); *see also Retail Local 906*, 921 F. Supp. at 131 (holding that, "[u]nder New York law, 'an insurance policy issued in reliance on material misrepresentations is void from its inception'") (quoting *Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan*, 77 F.3d 48, 52 (2d Cir. 1996)).

By definition, a misrepresentation is a false "statement as to a past or present fact, made to the insurer by [the applicant] . . . as an inducement to the making [of the contract]." N.Y. Ins. Law § 3105(a). A misrepresentation is material if the insurer would have refused to issue that particular insurance policy had it been aware of the facts misrepresented; the insurer need not prove that it would have refused coverage altogether. *See id.* (citations omitted); N.Y. Ins. Law § 3105(b)-(c) (referring to "such" contract rather than to "any" contract); *see also Aetna Cas. & Sur. Co. v. Retail Local 906 of AFL-CIO Welfare Fund*, 921 F. Supp. 122, 131 (E.D.N.Y. 1996) (holding that "the insurer need not prove that it would not have issued any policy at all, but that the policy in question would not have been issued") (citing *Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 32-34 (2d Cir. 1988)). However, a party may not rely on conclusory allegations by insurance company employees to establish materiality as a matter of law; rather, "the insurer must present documentation concerning its underwriting practices, such as underwriting manuals, bulletins, or rules pertaining to similar risks, which show that it would not

have issued the same policy if the correct information had been disclosed in the application." *Parmar*, 21 A.D.3d at 540 (citations omitted). Generally, the issue of materiality of the misrepresentation is a question of fact for the jury. *See Tyras v. Mount Vernon Fire Ins. Co.*, 36 A.D.3d 609, 610 (2d Dep't 2007) (quotation omitted).

United National contends that it was not required to submit manuals or other underwriting guidelines to establish that the misrepresentations were material as a matter of law. *See* Dkt. No. 63 at 6-8. Rather, United National argues that the "manual requirement only makes sense in the scenario of mass marketed, high volume, ubiquitous types of insurance clerically underwritten following predetermined criteria set forth in manuals (like auto, life or homeowners insurance)." *Id.* at 7. Further, United National asserts that "[a]s to relatively unique risks (like error and omissions insurance for agencies utilizing self-insurance trusts as the security for their insurance placements) underwritten by experienced underwriters, application of the same rule could act to almost always preclude rescission as a matter of law, no matter how egregious the circumstances of the misrepresentations." *Id.*

Although the Court agrees with United National that such manuals and other evidence are not required in all situations in order for the Court to decide materiality as a matter of law, the alleged misrepresentations in the present matter are not sufficiently "egregious" for the Court to decide the issue.

In *Chicago Ins. Co. v. Kreitzer & Vogelman*, No. 97 CIV. 8619, 2000 WL 16949 (S.D.N.Y. Jan. 10, 2000), the plaintiff issued several professional liability coverage policies to the defendant law firm from 1994 through 1997. *See id.* at *3-*4. At the time the applications for insurance coverage were completed, one of the partners at the law firm was the subject of various charges of professional misconduct relating to his alleged mishandling of several personal injury

matters. *See id.* at *2. Hearings had been conducted on those disciplinary matters in December of 1993 and May of 1994, and the charges were amended in February of 1995 to allege the partner's neglect of eight additional personal injury matters. *See id.* After the majority of the charges against the partner were sustained, on February 18, 1997, he was suspended from the practice of law for three years. *See id.*

The plaintiff sought to rescind its coverage in 1997, arguing that the defendant falsely represented in its applications for insurance that there were, among other things, "no claims, incidents, acts or omissions in the last year which might have reasonably been expected to be the basis of a claim or suit arising out of the performance of professional services for others." *Id.* In the application dated December 30, 1994, the defendant indicated that it was not aware of any claim, incident, act or omission in the past year which might reasonably be expected to be the basis of a claim or suit arising out of the performance of professional services. *See id.* at *1. Denying the plaintiff's motion for summary judgment, the court held that "[w]hile the potential materiality of the specific misrepresentations at issue in this case cannot be understated, however, CIC has failed to submit any proof of its underwriting practices other than an affidavit of its underwriter. It is well settled that the conclusory affidavit of an underwriter is not sufficient, standing alone, to establish materiality as a matter of law, and supporting documentation such as underwriting manuals, rules, or bulletins is typically required." *Id.* at *7 (citations omitted). Further, the court found unpersuasive the plaintiff's argument that such documentation was not submitted because its underwriting guidelines do not address the "extraordinary situation" created by the "alleged uniqueness of the nondisclosure[.]" *Id.* at *7 n.7.

In the present matter, the Court finds that questions of fact prevent the Court from finding as a matter of law that there was a material misrepresentation. As to the 2009 Policy, in support

of its motion, United National submitted the affidavit of Ronald Hihn who was an underwriter for Doran Excess Underwriters, Inc. (known as "Dorex"). Mr. Hihn states several times, without citation to any relevant underwriting manuals or guidelines, that had he known things that he now believes should have been disclosed on the 2009 application but were not, United National would not have issued the 2009 Policy. *See* Dkt. No. 53-53. Given the changing statutory and regulatory landscape surrounding self-insured trusts during this time frame, as well as the lack of documentary support, the Court finds that it cannot decide whether the alleged omissions and misrepresentations were material as a matter of law. *See Chicago Ins. Co.*, 2000 WL 16949, at *7; *Feldman v. Friedman*, 241 A.D.2d 433, 434 (1st Dep't 1997); *Gibbons v. John Hancock Mutual Life Ins. Co.*, 227 A.D.2d 963, 964 (4th Dep't 1996); *Carpinone v. Mutual of Omaha Ins. Co.*, 265 A.D.2d 752, 754-55 (3d Dep't 1999); *Chicago Ins. Co. v. Kreitzer & Vogelman*, 210 F. Supp. 2d 407, 411-12 (S.D.N.Y. 2002) (citations omitted).

With respect to the 2011 and 2012 Policies, United National submitted the affidavit of Veronika A. Buck. *See* Dkt. No. 53-57. According to Ms. Buck, after Dorex closed in 2010, applications for insurance agents and brokers professional liability policies were submitted to and evaluated directly by United National where she was employed as an underwriter. As PRM correctly argues, Ms. Buck's affidavit suffers from the same infirmities as Mr. Hihn's. Only once does she refer to the "United National Insurance Company's Third Party Administrator's Professional Liability Program administered by Doran Excess Underwriters Inc. Rate Schedule." *Id.* at ¶ 26. Significantly, however, Ms. Buck does not indicate that this document was relied upon in evaluating the 2011 and 2012 Policies. Further, as mentioned, Doran/Dorex closed in 2010 and it is unclear whether this rating schedule was still in use considering it explicitly applied to Doran/Dorex.

The cases in which courts have found materiality as a matter of law have generally involved such extraordinary facts that only one conclusion could possibly be reached by a rational jury. *See, e.g., Continental Cas. Co. v. Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380, 392-93 (S.D.N.Y. 2014) (finding that the misrepresentations were material as a matter of law where the insured was involved in an ongoing criminal conspiracy despite the lack of documentation regarding underwriting guidelines because "[o]ne can hardly expect an insurer to maintain written guidelines as to how an admission of an ongoing criminal fraud would affect the decision whether to issue a malpractice policy; not only would such an admission never, as a practical matter, be made, but the effect on the insurer's decision is so obvious that written guidelines would be not just superfluous, but downright silly"); *Chicago Ins. Co. v. Fasciana*, No. 04-cv-7934, 2006 WL 3714310, *5-*6 (S.D.N.Y. Dec. 13, 2006) (same). The facts before the Court in the present matter simply do not rise to that level. While it appears that misrepresentations were made and information requested was clearly omitted, the record before the Court is insufficient for the issue of materiality to be decided as a matter of law. *See Campese v. National Grange Mut. Ins. Co.*, 259 A.D.2d 957, 958 (4th Dep't 1999) (holding that the trial court erred in finding that misrepresentations regarding previously having insurance cancelled and that the applicant had no insurance loss history were material as a matter of law).

Based on the foregoing, the Court denies United National's motion for summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that United National's motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 31, 2016
       Albany, New York

Mae A. D'Agostino
U.S. District Judge